Estate of B. F. WHITAKER, Deceased, First National Bank in Dallas and Lanham Croley, Co-executors of the estate of B. F. Whitaker, Deceased, and Florence D. Whitaker, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 16806.

United States Court of Appeals Fifth Circuit.

Sept. 16, 1958.

Llewellyn A. Luce, Washington, D. C., Lanham Croley, Dallas, Tex., for petitioners.

David O. Walter, Fred E. Youngman, Harry Baum, Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., John N. Stull, Acting Atty. Gen., Nelson P. Rose, Chief Counsel, Charles P. Dugan, Sp. Atty., Internal Revenue Service, Washington, D. C., for respondent.

Before HUTCHESON, Chief Judge, and BROWN, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This case concerns some of the tax problems of a racehorse owner. Two tax principles are involved: "claim of right" and "accelerated depreciation". The appeal presents these questions:

I. As to the horse *Requested:* When a breeding contract guarantees a live foal, are stud fees income in the year the fees are received, under the claim of right doctrine, or

in the following year in which the foal is born?

II. As to the horse *Baby Jeanne:* Is a taxpayer entitled to accelerated depreciation on a racehorse in the year the horse bows a tendon and can no longer race or must the resulting loss in value of the horse be treated as a capital loss in the year in which the horse is sold?

The Commissioner and the Tax Court determined that the fees for Requested's services were income when received; that the taxpayer could not take accelerated depreciation on Baby Jeanne. We agree.

I. Requested and Claim of Right

B. F. Whitaker (deceased) was in a number of businesses, including horse racing and horse breeding. The income from horse racing was reported on the accrual basis and was on the same schedule with the income from horse breeding. To determine the net income from the whole operation of the Whitaker stable, all of the expenses of the stable were deducted. The record does not show what expenses were attributable to racing and what to breeding, or whether expenses were recorded on a cash or accrual basis.

During the years 1944 through 1951 Whitaker owned a stallion named Requested. Requested stood for breeding purposes at Spendthrift Farm, Lexington, Kentucky.

The period of gestation for a horse is eleven months. Usually a mare is bred in the spring. The foal therefore is born the next year. Under the terms of Whitaker's breeding contracts, a live foal is guaranteed. When it is determined that the mare is in foal, in the fall of the year, the owner pays the breeding fee; if a foal is not born alive the fee is refunded.

Whitaker consistently reported each breeding fee as income in the year in which the foal was born.[1] Most of the fees were paid in the year when the mare was bred. Whitaker treated the payments as deposits and recorded the amounts on the books in a suspense account. For several years he purchased cashier's checks for the amounts paid and held the checks until the following year when the foals were born. These checks were not put into any kind of a trust fund.

Federal taxes are keyed to a system of annual accounting. Section 42 of the 1939 Code states the general rule: "The amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under section 41, any such amounts are to be properly accounted for as of a different period". 26 U.S.C.A. (1952 ed.) Section 42. Section 41 allows net income to be "computed upon the basis of the taxpayer's annual accounting period [here the calendar year] in accordance with the method of accounting regularly employed in keeping the books of such taxpayer". But "if the method employed does not clearly reflect the income [on an annual accounting basis], the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income". 26 U. S.C.A. (1952 ed.) Section 41. The effect of Section 41 is to vest the Commissioner with discretion—not to be abused—to determine whether the taxpayer's method of accounting clearly reflects income.[2]

1. The amounts of $8,000, $30,000, and $26,250 were collected as breeding fees for foals bred in the years 1948, 1949, and 1950, respectively. The amounts were returned as income in the year in which the foals were born; $8,000 in 1949, $30,000 in 1950, and $26,250 in 1951, respectively. Any fees that were collected in the year in which the foals were born were reported as income in that year. The Commissioner determined that the fees collected in 1948, 1949, and 1950 should be reported as income in the year received and that any refunds made because of no live foal being born in a subsequent year could be deducted from income in the year the refund was made.

2. "The statutory provision, § 41, supra, giving to the Commissioner the authority to make computations by such method as in his opinion clearly reflects income is a grant of wide discretion, and his action may be challenged only upon a

The Commissioner determined that the taxpayer's method of accounting did not clearly reflect income, since the fees were received under a claim of right and were income at the time of receipt. The taxpayer argues that the object of a breeding contract is to obtain a live foal. The contract is not completed and the fee earned until the year when the foal is born. The taxpayer contends therefore that the completed contract method, as he used it, clearly reflects the income from breeding fees; and, that his accounting has been consistent over the years.

■ The claim of right doctrine is firmly established in our tax law.[3] If a taxpayer receives earnings under a claim of right, without restriction as to its use, it is taxable income in the taxable year when he receives the earnings. The principle applies even though in a later year he may be required to refund all or part of the money. It applies whether returns are on the cash or accrual basis. Any amount repaid is deductible in the year of repayment (on the cash basis) or the year in which the liability to repay becomes fixed (on the accrual basis). North American Oil Consolidated v. Burnet, 1932, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197; United States v. Lewis, 1951, 340 U.S. 590, 71 S.Ct. 522, 95 L.Ed. 560; Healy v. Commissioner, 1952, 345 U.S. 278, 73 S.Ct. 671, 97 L.Ed. 1007; Automobile Club of Michigan v. Commissioner, 1956, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746.

Whether fees are received under a claim of right depends upon the particular circumstances of each case.

■ The record in this case does not contain the exact terms of the verbal breeding contract. Fees were paid when a mare's owner found that it was in foal and not at the time the mare was bred.[4] As the Tax Court observed, "All that remained was a contingent liability, if the foal was not born alive the fee would have to be refunded." A contingent liability to make refunds in the following year is not deductible in the year the fees are received. Brown v. Helvering, 1934, 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725. Security Flour Mills v. Commissioner, 1944, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725.

clear showing that he has abused his discretion. Standard Paving Co. v. Commissioner of Internal Revenue, 10 Cir., 1951, 190 F.2d 330." Wood v. Commissioner of Internal Revenue, 5 Cir., 1957, 245 F.2d 888, 892.

3. "Not infrequently, an adverse claimant will contest the right of the recipient to retain money or property, either in the year of receipt or subsequently. In North American Oil Consolidated v. Burnet, 1932, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197, we considered whether such uncertainty would result in an amount otherwise includible in income being deferred as reportable income beyond the annual period in which received. That decision established the claim of right doctrine 'now deeply rooted in the federal tax system.' The usual statement of the rule is that by Mr. Justice Brandeis in the North American Oil opinion: 'If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent.' 286 U.S. at page 424, 52 S.Ct. [613] at page 615.

"The phrase 'claim of right' is a term known of old to lawyers. Its typical use has been in real property law in dealing with title by adverse possession, where the rule has been that title can be acquired by adverse possession only if the occupant claims that he has a right to be in possession as owner. The use of the term in the field of income taxation is analogous. There is a claim of right when funds are received and treated by a taxpayer as belonging to him. The fact that subsequently the claim is found to be invalid by a court does not change the fact that the claim did exist." Healy v. Commissioner, 1952, 345 U.S. 278, 73 S.Ct. 671, 673, 97 L.Ed. 1007.

4. That decedent became entitled to the fee when it was determined that the mare was in foal, subject only to the contingency pointed out by the Tax Court, is indicated by the difference between the large number of "barren" results reflected on Requested's breeding record and the relatively few refunds reflected by the evidence.

Here, there was no restriction on the use of the fees. They were not deposited in escrow. They were not placed in trust. Whitaker chose to hold the fees as deposits or advances until the foal was born, but that was his personal decision how to use the funds. The contract or understanding between the parties attached no strings, and Whitaker had the full economic benefit of the fees.

The completed contract method of reporting income is based on Section 29.42–4 of Treasury Regulations 111.[5] It applies to "income from long-term contracts", defined as "building, installation, or construction contracts covering a period in excess of one year". The purpose is to adjust the normal accounting period to coincide with the term of the construction contract, so that the total cost and the total return of the single contract are matched in a single accounting period. Daley v. United States, 9 Cir., 1957, 243 F.2d 466, 470. In the instant case, the record shows that all of the expenses of the stable operation were deducted without indicating what expenses were attributable to horse breeding. The accounting therefore does not reflect profit in individual contracts by matching costs against returns realized from the individual contracts.

In Wood v. Commissioner, 5 Cir., 1957, 245 F.2d 888, 892, the taxpayers did not report their payments on a land sale installment contract until the year in which final payment was made and the deed delivered. This Court held that the provisions of Reg. 111, Section 29.42–4 do not apply to installment sales of real estate, because such sales "are in no sense building, installation or construc-

tion contracts". We held that the installment payments, received without any restriction as to use, were income when received. In South Dade Farms, 5 Cir., 1943, 138 F.2d 818, the taxpayer, on an accrual basis, collected advance rentals that were treated as income in the fiscal year during which the rentals were earned, and expenses incurred in the operation of a drainage and irrigation system. We held that advance rentals were income when received and that the taxpayer's method of accounting did not clearly reflect its income.

Automobile Club of Michigan v. Commissioner, 1956, 353 U.S. 180, 77 S.Ct. 707, 712, 1 L.Ed.2d 746, is directly in point. That case involved membership dues collected in advance for one year. The club reported the dues as income on a monthly basis over the ensuing year. As in this case, the taxpayer did not deny that it had the right to the unrestricted use of dues income in the year of receipt, but contended that its accrual method of accounting clearly reflected its income. The court held that the allocation of the dues in monthly amounts bore no relation to the services the club might be called upon to render; that the Commissioner had not gone beyond permissible limits in the exercise of his discretion in determining whether the taxpayer's method of accounting clearly reflects income.

The taxpayer relies upon Beacon Publishing Co. v. Commissioner, 10 Cir., 1955, 218 F.2d 697, 700, reversing 21 T.C. 610, and Schuessler v. Commissioner, 5 Cir., 1956, 230 F.2d 722, reversing 24 T.C. 247.[6] In Beacon Publishing Company the court held that the claim

---

5. "Sec. 29.42–4. Long-Term Contracts.— Income from long-term contracts is taxable for the period in which the income is determined, such determination depending upon the nature and terms of the particular contract. As used in this section the term 'long-term contracts' means building, installation, or construction contracts covering a period in excess of one year from the date of execution of the contract to the date on which the contract is finally completed and accepted."

6. In Automobile Club v. Commissioner the Court distinguished these cases: "Beacon Publishing Co. v. Commissioner, 10 Cir., 218 F.2d 697, and Schuessler v. Commissioner, 5 Cir., 230 F.2d 722, are distinguishable on their facts. In Beacon, performance of the subscription, in most instances, was, in part, necessarily deferred until the publication dates after the tax year. In Schuessler, performance of the service agreement required the taxpayer to furnish services at specified times in years subsequent to the tax

of right doctrine should not be applied to prepaid newspaper subscriptions when there was no dispute as to the ownership of the funds and the only question was the year in which the funds should be taxed. The court held that the income should be reported over the life of the subscription. But in that case the court based its holding on the ground that the Tax Court "gave no consideration to the fact that the taxpayer accounts for its income under the accrual method and will not incur the expenses necessary to earn the income until following taxable years. * * * The application of the doctrine would in most cases result in a distortion of an accrual taxpayer's true income. * * * Such an application of the rule requires the taxpayer to report its prepaid income on a cash basis and to accrue its deductions. It creates a hybrid bookkeeping system and results in a tax return which does not clearly reflect income". That is not this case. Here, expenses incident to earning the breeding fees were incurred in the same year the fees were earned and received. There are no expenses necessarily to be incurred in the following year to be off-set against earning the income. In the case of a subscription, as pointed out by the Supreme Court in Automobile Company of Michigan, "performance of the subscription [the expense to be set off against income], in most instances, was, in part necessarily deferred until the publication dates after the tax year".

Schuessler v. Commissioner involved a taxpayer's deduction of a reserve set up to cover estimated future costs of carrying out service guarantees for five years given with the sale of furnaces. The contract required Schuessler to turn the furnace on and off each year for five years. Schuessler's reserve was for future expenses which the taxpayer was obligated to pay under the terms of the contract. Whitaker had no reserve for estimated refunds or future expenses.

Whitaker sought to defer the reporting of all fees on the contingency that one or more of the foals would be stillborn.

We cannot agree that the fees were not earned until the foal was born. That was not the construction the parties placed on their verbal agreement. The owner of a mare serviced by Requested paid the entire fee when he determined that the mare was in foal. No part of the fee was withheld pending birth of a live foal.

■ Whitaker was not in the position of allocating income to a later year in which related expenses incident to earnings would be incurred; or of deferring receipts not yet earned; or of setting up a reserve for future expenses he was obligated to incur under the terms of a contract for future services. He failed to report as income fees for services performed in the taxable year, earned at that time, received at that time, with no restriction on his use of the funds—except a bookkeeping entry he chose to make and could unmake. In short, the stud fees were earned income in an economic sense when received; they were not prepayments. Under the circumstances presented in this case, we hold that the Commissioner did not exceed permissible limits in determining that the taxpayer's method of accounting did not clearly reflect income.

II. Baby Jeanne and Accelerated Depreciation

Whitaker bought Baby Jeanne August 23, 1948 for $9,000. Baby Jeanne won no races in 1949. During that year she bowed a tendon partially and was placed on a farm in Kentucky from April to October, 1949. During 1950 Baby Jeanne raced 19 times and placed twice, winning $750. October 14 she bowed a tendon completely. As a racehorse she had no more value. Whitaker sold Baby Jeanne in December 1950 for $1,000.

In his 1948 and 1949 returns Whitaker deducted depreciation on Baby Jeanne

year. In this case, substantially all services are performed only upon a member's demand and the taxpayer's performance was not related to fixed dates after the

tax year. We express no opinion upon the correctness of the decisions in Beacon or Schuessler."

of $375 and $1,125, respectively, based on an estimated useful life of eight years and computed on the straight line method. On the 1950 tax return he reported the sale of Baby Jeanne and claimed depreciation of $6,500 (the difference between the cost, less depreciation previously claimed, and the sale price of $1,000).[7] The Commissioner allowed depreciation on the horse in 1948, 1949, and 1950 in the amounts of $500, $1,500, and $1,500, respectively. The Commissioner allowed the difference between the depreciated cost ($5,500) and the sale price ($1,000), or $4,500 as a long term capital loss. The Tax Court upheld the Commissioner.

The taxpayer argues that the allowance for depreciation in any given year must be determined in accordance with the conditions existing at the end of the year. At the end of 1950 Baby Jeanne had a completely bowed tendon and was useless as a racehorse. The sale of Baby Jeanne merely established its salvage value. A racehorse is like a delicate piece of machinery subject to wear and tear. On October 14, 1949 Baby Jeanne did not bump a horse or run into the rail. She was not hit by an automobile. Baby Jeanne's delicate horseflesh broke down from wear and tear. Accordingly, extraordinary or abnormal depreciation should be allowed, since the horse suddenly depreciated and lost its entire value as a racehorse. So the taxpayer contends.

Section 23(l) of the 1939 Code authorizes a "reasonable allowance" for the "exhaustion, wear and tear (including a reasonable allowance for obsolescence)" of property used in trade or business. The allowance for depreciation is an amount allocable annually over the useful life of the depreciable property on the assumption that the aggregate of such amounts, plus salvage value at the end, will equal the cost or other basis of the property. Regulations 111, Section 29.23(1)–1. The Commissioner recognizes that under unusual conditions accelerated depreciation may be allowed, but only when it is shown that the decrease "in the normal useful life [results] from exceptional operating conditions or else. * * * Any modification of normal depreciation, therefore, must be confined to those items the useful lives of which are controlled by the factor of wear and tear. * * * [For example], when delicate machinery * * * is operated at a heavy overload of its normal capacity".[8] We consider the Commissioner's position on this point reasonable and within the tax concept of depreciation.

■ A racehorse may be like a delicate piece of machinery. But, on a straight line basis, an allowance for accelerated depreciation depends upon showing that the effective life of the machinery was shortened by excessive use, added wear and tear. Commissioner v. H. E. Harman Coal Corp., 4 Cir., 1952, 200 F.2d 415, 419, affirming H. E. Harman Coal Corp., 1951, 16 T.C. 787, 802 and cases cited; Copifer Lithograph Corporation, 1949, 12 T.C. 728.

■ The petitioner has shown that the effective life of Baby Jeanne as a racehorse was cut short prematurely. He has not shown that it was cut short by excessive use through added, abnormal wear and tear. As defined by petitioner's witness, when a tendon bows "the ligament from the knee to the ankle breaks through what they call a sheath, and when it does, it kind of bows out like that and when they do that when they have a complete bow, then they cannot race anymore". It seems to us, as it seemed to the Commissioner and the Tax Court, that bowing of a tendon is similar to an accident or the sudden malfunctioning of a piece of machinery. At any

7. The decedent deducted depreciation of $6,500 for 1950 on his 1950 return, being the difference between cost ($9,000) less depreciation deducted in 1948 and 1949 ($1,500) and the sale price. On the basis of the Commissioner's depreciation allowance for 1948 and 1949 ($2,000) the accelerated depreciation now claimed would be $6,000.

8. Bulletin F., 2 Prentice-Hall Tax Service, 1952 Ed., para. 14,140, p. 14073.

rate, there is no showing in the record of any connection between the injury and excessive use. Such a showing we regard as essential for the taxpayer to be entitled to an allowance for accelerated depreciation.

The judgment is

Affirmed.