T.C. Memo. 1997-565


UNITED STATES TAX COURT


SARKIS N. AND BAKA S. BALABANIAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15947-95.                   Filed December 23, 1997.


<u>Richard P. Slivka</u> and <u>Charles D. Henson</u>, for petitioners.

<u>Virginia L. Hamilton</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined a $189,212 income tax
deficiency and a $37,842 penalty under section 6662[1] for

---

[1] Unless otherwise indicated, section references are to the
Internal Revenue Code in effect for the period under
consideration.  Rule references are to this Court's Rules of
Practice and Procedure.

petitioners' 1990 taxable year. The issues[2] presented for our consideration are: (1) Whether respondent correctly reconstructed petitioners' income by use of the bank deposits method, and (2) whether petitioners are liable for a penalty under section 6662.

## FINDINGS OF FACT[3]

Petitioners resided in Boulder, Colorado, at the time their petition was filed in this case. Sarkis Balbanian (petitioner), a jeweler since 1956, beginning in 1987 owned and operated a retail jewelry business located in Northglenn, Colorado. Petitioners used the cash method of accounting for financial and tax reporting purposes.

Petitioner met Robert Joseph (Joseph) and, about 1983, began manufacturing and/or selling jewelry to Joseph. Joseph operated a Ponzi scheme under the name M&L Business Machine Co., Inc. (M&L). Under the scheme, Joseph accepted currency from individuals and promised them an extraordinary rate of return on a monthly basis. The scheme was operated by Joseph's paying "investors" monthly interest funded by the currency received from newer investors. At some point, Joseph turned to check kiting to keep his Ponzi scheme afloat.

---

[2] Petitioners conceded a third issue of whether their cost of goods sold was overstated by $15,000 for 1990.

[3] The parties' stipulation of facts and attached exhibits are incorporated by this reference.

Beginning in 1988, petitioners became involved in a complex and circuitous relationship with Joseph. Petitioners' involvement with Joseph began with $30,000 and increased to over $200,000 by July 1990. The monthly "interest" paid by Joseph was either paid to petitioners or credited as an increase in their investment. Petitioners did not report any interest from these transactions on their Federal income tax returns, including the 1990 return. M&L also made payments totaling $10,000 toward petitioners' purchase of a motor vehicle.

Also beginning sometime in 1988, petitioner became involved with Joseph/M&L in a check exchanging arrangement that ultimately became part of a check kiting scheme. M&L had cash-flow problems, and the goal of the scheme was to obtain some "float" in order to extend the time to pay commitments. The kiting also made it appear that M&L had more cash because of the inflation caused by the kiting activity. Under the arrangement, M&L would draw a check in favor of petitioner, and petitioner, in turn, would draw several checks totaling approximately the same amount to M&L. For 1989 and 1990, M&L's checks to petitioner exceeded petitioner's checks to M&L as follows:

|  | 1989 | 1990 |
|---|---|---|
| Amount from M&L | $5,866,328 | $3,263,124 |
| Amount to M&L | 5,815,280 | 2,571,129 |
| Excess received by petitioner | 51,048 | 691,995 |

Petitioners did not report for 1989 or 1990 income from the check exchanging arrangement. Also, during July 1990, M&L caused a $207,000 check to be deposited in petitioners' Santa Barbara Savings and Loan account.

Clara Spake (Spake) had been petitioners' tax return preparer for about 15 years, and she prepared their 1990 return. She was aware of the check exchanges with M&L, and she kept track of them for a short time during 1988. Spake advised petitioner that she did not know whether it was illegal, but if petitioner came out ahead of M&L in any year, the difference would be income. Petitioner encouraged several others, including Spake, to invest with Joseph/M&L, and he received a "broker fee" for new investors steered to M&L. Petitioner's broker fee was "paid" by means of increases to his M&L investment. M&L filed for bankruptcy during October 1990, and petitioners, in August 1993, filed a $140,000 claim against the M&L bankrupt estate.

Spake performed the monthly bookkeeping and prepared petitioners' annual tax returns, computing income on the basis of the jewelry store register receipts and undocumented information from petitioner. Petitioner, in addition to selling jewelry through his store, manufactured and sold custom jewelry. Numerous payments for custom jewelry received by petitioner were not run through the jewelry store register and, instead, were reported orally to Spake without documentation subject to verification. Spake recorded petitioners' business bank deposits

in a ledger, but she did not verify or check the amount of the bank deposits in relation to the amount of recorded sales.

During October 1992, M&L's bankruptcy trustee filed a complaint against petitioners to recover any funds they held that may have belonged to the bankruptcy estate. Petitioners were represented by Kevin Allen (Allen) in the bankruptcy matter. The trustee was seeking amounts approaching $5 million from petitioners on the theory of preferential transfers and fraudulent conveyances. Petitioners contended that they held no funds or assets of M&L, and they also disputed whether the asserted legal theories applied to them. A settlement was reached, and petitioners paid the bankruptcy estate $280,000 ($220,000 in 1993 and $60,000 in 1994).

Respondent's agent, Monty Careswell (Careswell), a certified public accountant with a master's degree in taxation, began an examination of M&L and related individuals, including petitioners. Initially, Careswell examined petitioners' involvement with M&L and attempted to reconstruct petitioners' income using a check exchange analysis, but he found that the payments from M&L for jewelry and those for the check exchanges could not be distinguished. Additionally, Careswell could not reconcile or verify the gross jewelry sales reported by petitioners. Careswell concluded that petitioners' records were inadequate, and he prepared a bank deposits reconstruction of petitioners' income.

Careswell performed the following steps in his bank deposits analysis for petitioners' 1990 taxable year: He calculated total deposits of $4,898,961 from four different accounts, including Colorado National Bank, Bank of Boulder, Santa Barbara Savings and Loan, and Merrill Lynch. From that amount he subtracted nontaxable deposits of $1,148,549 and income reported by petitioners of $594,374, and he added cash and other income items of $34,646, to arrive at unexplained deposits not reported of $3,190,684. Careswell then made a further reduction of $2,571,129, representing the transfers from petitioners to M&L, thereby arriving at $619,555 of unreported income for 1990. Careswell did a similar analysis for 1989 and determined unreported income of $106,104.

## OPINION

Respondent, by means of a bank deposits analysis, reconstructed petitioners' 1990 income. Petitioners do not disagree with respondent's bank deposits mathematics. Instead, petitioners question respondent's use of the bank deposits analysis over the check spread analysis. In addition, petitioners argue whether they should have to recognize the portions of the bank deposits attributable to the check exchange scheme with M&L. Petitioners assert that they were not entitled to any portion of the income attributable to the check exchanges until the resolution of the bankruptcy proceedings in 1993. Accordingly, we must consider whether respondent's use of the

bank deposits method was reasonable and whether petitioners must recognize any portion of the income attributable to the check exchanges in 1990.

The Commissioner may use a method to clearly reflect income if a taxpayer does not maintain adequate records. Sec. 446(b); Holland v. United States, 348 U.S. 121 (1954); sec. 1.446-1(b)(1), Income Tax Regs. A bank deposits reconstruction of income is one method the Commissioner may use to determine income. DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992). The bank deposits analysis is conducted by examining deposits into an individual's bank account. Reported income and any nontaxable items are subtracted from total deposits in order to determine unreported income. Unexplained bank deposits are prima facie evidence of income where a taxpayer has failed to maintain adequate records. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). The evidence here shows that petitioners' records were inadequate and that there were sources of income petitioners did not report. Therefore, respondent's use of the bank deposits analysis was justified by the circumstances.

When using the bank deposits method, the Commissioner is not required to show that each deposit or part thereof constitutes income, Gemma v. Commissioner, 46 T.C. 821, 833 (1966), or that it came from a likely or particular source. Clayton v. Commissioner, 102 T.C. 632, 645 (1994); Estate of Mason v.

Commissioner, 64 T.C. 651, 656-657 (1975), affd. 566 F.2d 2 (6th Cir. 1977).

The parties stipulated that Agent Careswell's bank deposits analysis is correctly computed. Normally, when the Commissioner's agents have performed such an analysis, taxpayers attempt to show that the bank deposits analysis is faulty by identifying nontaxable deposits. By stipulating to the mathematical correctness of respondent's bank deposits analysis, petitioners are left with the option of either showing a method that more correctly reflects income or explaining why particular deposits are nontaxable.

Petitioners argue that a check exchange analysis rather than a bank deposits analysis should be used to determine petitioners' taxable income. Petitioners, however, do not precisely explain how the bank deposits analysis should be adjusted to account for their theory. In particular, they do not account for the possibility that other likely and demonstrated sources of unreported income may be more accurately reflected by the bank deposits analysis. It is petitioners' obligation to show that particular deposits or amounts should be subtracted from the deposits computed by respondent. Parks v. Commissioner, 94 T.C. 654, 658 (1990). This petitioners have not done.

Petitioners contend that we should rely on a modified version of the bank deposits analysis that was performed by Agent Careswell. Careswell prepared a check spread to analyze

petitioners' check exchange involvement with M&L.  Careswell was unable to reconcile petitioners' deposits with their records and found that the records were inadequate. Therefore, Careswell turned to a bank deposits analysis to reconstruct petitioners' income from all sources, including the involvement with M&L and the jewelry business.

Using the bank deposits analysis, Careswell calculated total deposits of $4,898,961 and subtracted nontaxable deposits of $1,148,549 and the income reported by petitioners of $594,374. To that amount he added cash and other income items of $34,646 to arrive at taxable deposits not reported of $3,190,684.  Careswell then made a further reduction of $2,571,129, representing petitioners' payments and transfers to M&L under the check kiting scheme.  This resulted in net unexplained bank deposits of $619,555 for 1990.

The $2,571,129 amount by which Careswell reduced the unexplained bank deposits was determined from his check spread analysis of check exchanges with M&L.  Careswell's analysis reflects $3,263,124 remitted by M&L to petitioners and $2,571,129 remitted by petitioners to M&L for a net excess to petitioners of $691,995 for 1990.  Petitioners argue that their unreported taxable income should be determined using the net difference from the check spread analysis reduced for certain adjustments asserted by petitioners.

First, petitioners assert that Careswell's analysis overstates the net difference by approximately $75,000. In part, the difference between Careswell's analysis and petitioners' is that Careswell analyzed the check exchanges on an annualized basis, and petitioners' analysis is for a continuum beginning January 2, 1989, through October 3, 1990. Petitioners then further reduced the net excess from the check exchanges by amounts of alleged jewelry sales to M&L in the approximate amounts of $126,000 for 1989 and $176,000 for 1990. In addition, petitioners deducted the $280,000 settlement paid by them to the bankruptcy trustee in 1993 and 1994. By ignoring annual accounting principles and by means of the other reductions from Careswell's analysis, petitioners attempt to reduce the amount of the net difference between M&L's and their check payments to approximately $161,000, as opposed to the $691,995 developed in Careswell's check exchange analysis.

Respondent contends that the reductions proposed by petitioners are improper. For example, some of petitioners' reductions are based on the presumption that Careswell included in his check exchange analysis amounts that should have been attributed to jewelry sales from petitioners to M&L. Respondent contends that petitioners' financial records were inadequate to permit accurate delineation between jewelry sales and M&L check exchanges. In that regard it cannot be determined whether any of those jewelry sales occurred and/or were included in part or

- 11 -

whole in the sales reported on petitioners' 1990 return. Because respondent has given credit for the sales petitioners reported, the reductions proposed by petitioners may be duplications. Since petitioners have failed to distinguish adequately between the jewelry sales and M&L check exchanges, respondent's determination stands.

We also note that petitioners have not shown how their adjustments to Careswell's check exchange analysis can be integrated with the bank deposits analysis. In addition, petitioners have not shown that the check exchange analysis performed by Careswell and/or the modified version advanced by petitioners would more accurately reflect income than the bank deposits method used by respondent. The record reflects more than one potential source of unreported income, and the check exchange analysis would only partially address that aspect, whereas the bank deposits analysis would include all deposited and identified income from all sources.

Petitioners' final argument is an attempt to attack indirectly the bank deposits analysis by arguing that any income from the check exchanges was either not known or not reportable until after the 1990 taxable year. Relying on the includability rule of section 451 and cases[4] addressing whether there is a

---

[4] Some of the cases cited by petitioners include Estate of Whitaker v. Commissioner, 259 F.2d 379, 382 (5th Cir. 1958), affg. 27 T.C. 399 (1956); Penn v. Robertson, 115 F.2d 167, 173
(continued...)

"fixed or unconditional right to receive" income, petitioners argue that they were not required to report any income they may have had from the check exchanges until the matter was finally resolved during 1993 in the bankruptcy proceeding.  Petitioners' argument is premised on their contention that the check exchanges represent the heart of respondent's bank deposits analysis and that the analysis would be defective if any income from the exchanges were not taxable for 1990.  Respondent argues that under the claim of right doctrine petitioners should report the excess of M&L payments over their payments to M&L.  We agree with respondent.

The principle of the doctrine is explained in the following quotation from Healy v. Commissioner, 345 U.S. 278, 281-282 (1953):

> Not infrequently, an adverse claimant will contest the right of the recipient to retain money or property, either in the year of receipt or subsequently.  In North American Oil v. Burnet, 286 U.S. 417 (1932), we considered whether such uncertainty would result in an amount otherwise includible in income being deferred as reportable income beyond the annual period in which received.  That decision established the claim of right doctrine "now deeply rooted in the federal tax system." The usual statement of the rule is that by Mr. Justice Brandeis in the North American Oil opinion:  "If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to * * * [report], even though it may still be claimed that he is not entitled to retain the money, and even though he may

----

[4](...continued)
(4th Cir. 1940); H. Liebes & Co. v. Commissioner, 90 F.2d 932, 938 (9th Cir. 1937), affg. 34 B.T.A. 677 (1936).

> still be adjudged liable to restore its equivalent."
> 286 U.S., at 424.
>      The phrase "claim of right" is a term known of old
> to lawyers.  * * *  There is a claim of right when
> funds are received and treated by a taxpayer as
> belonging to him.  The fact that subsequently the claim
> is found to be invalid by a court does not change the
> fact that the claim did exist.  * * *  [Citation
> omitted; fn. refs. omitted.]

Petitioners, on the cash basis, had an excess of receipts over payments for the 1990 taxable year in their exchanges with M&L.  Petitioners claimed as their own that excess and did not make any claim in the bankruptcy estate until 1993. Additionally, they resisted and denied any liability in connection with the trustee's claim against them.  Petitioners were made aware by their bookkeeper that if they were ahead of M&L at the close of the taxable year, they were liable for reporting the same as income.  Even though petitioners have argued that they were engaged in the check exchanges with M&L as a convenience, the record supports our finding that they expected to be and were compensated for assisting M&L in maintaining float and for their participation in the kiting scheme.  After the fact, the bankruptcy trustee sought a substantial amount from petitioners, and petitioners made a $140,000 claim against the bankrupt's estate.  Ultimately, however, petitioners settled the dispute by their payment to the bankruptcy estate of $280,000, part in 1993 and the remainder in 1994.  Petitioners could have accounted for the exchanges with M&L and known the amount they were ahead or behind, but they chose not do so and did not

require their bookkeeper to do so, even though she, in the initial stages, had done so. Petitioners are required to report, as income, the amount of the excess in their check exchanges with M&L.

Respondent also determined that petitioners are liable for substantial understatement penalties under section 6662. Petitioners bear the burden to show they are not liable for the penalty. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Section 6662 imposes the penalty on any portion of an underpayment of tax required to be shown on a return if, as pertinent here, there is any substantial understatement of income tax. Sec. 6662(b)(2). A substantial understatement exists if the amount of the understatement for the taxable year exceeds the greater of 10 percent of the amount of tax required to be shown on the return or $5,000. Sec. 6662(d)(1). A substantial understatement may be reduced for any item reported for which there was substantial authority or for which there was adequate disclosure of the facts. Sec. 6662(d)(2)(B). Substantial authority requires a showing that the weight of authorities supporting a taxpayer's position is substantial in relation to those supporting a contrary view. Antonides v. Commissioner, 91 T.C. 686, 702 (1988), affd. 893 F.2d 656 (4th Cir. 1990). In addition, no penalty will be applied to any portion of an underpayment if there was a reasonable cause for such portion and the taxpayer acted in good faith. Sec. 6664(c)(1).

Petitioners argue that they should not be liable for the penalty because "They held a good faith belief that the check exchange did not involve income to them." The facts of this case belie any claim of good faith on petitioners' part. Their bookkeeper/tax return preparer advised petitioners that any excess in their favor at the end of the year was taxable income. Also, petitioners failed to report any of the interest and/or broker fees either paid or credited to them by M&L. Finally, petitioners did not keep adequate books and records, and the bank deposits analysis shows a substantial understatement of income. Accordingly, we hold that the entire underpayment is subject to the section 6662 penalty.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent.</u>