T.C. Memo. 2001-145


UNITED STATES TAX COURT


SMARTHEALTH, INC., f.k.a. SEMANTODONTICS, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8048-99.                    Filed June 20, 2001.


<u>Jeffrey N. Kelm</u>, <u>Denton N. Thomas</u>, and <u>Dennis I. Leonard</u>,
for petitioner.

<u>David A. Winsten</u> and <u>J. Robert Cuatto</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income taxes of $306,731 and $80,346 for
the taxable years ending May 31, 1995, and May 31, 1996,
respectively.  The sole issue for decision is whether amounts
which petitioner received from its customers in excess of the

amounts petitioner was owed (customer overpayments) constitute gross income in the year of receipt.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

The stipulation of facts and the accompanying exhibits are incorporated by this reference. Petitioner is an Arizona corporation whose principal place of business was in Phoenix, Arizona, at the time the petition in this case was filed. During the years at issue, petitioner used the accrual method of accounting for tax reporting purposes.

Petitioner's Business

Petitioner's business involved the manufacture, sale, and distribution of health care marketing materials, health care educational materials, and clinical and infection control products. Petitioner's client base consisted of dental offices, veterinary clinics, and other health care professional offices located throughout the United States and Canada. During the years at issue, petitioner served approximately 55,000 customers.

The majority of petitioner's business marketing was conducted through mail-order catalogs. Petitioner took orders for its products through the mail, over the telephone, and

through sales representatives.  Petitioner's customers generally ordered small dollar amounts of merchandise, with the average order amounting to approximately $100.  Many of petitioner's customers placed orders on a periodic basis.

During the years in issue, petitioner received approximately 600 orders per day.  It was petitioner's goal and general practice to ship the ordered product on the same day the order was received.  With each shipment, petitioner enclosed an invoice containing a description of the product, the sales price, and applicable shipping and handling charges.  In addition, petitioner mailed monthly statements to those customers who had outstanding balances payable to petitioner.

Petitioner offered its customers a variety of payment options, including open credit, cash on delivery, and payment by credit card.  Petitioner's customers who paid by check sent their payments directly to a lockbox operated by Marshall and Isley Thunderbird Bank (the lockbox agent).  It was the responsibility of the lockbox agent to empty the lockbox, process the payments, and deposit the payments to petitioner's non-interest-bearing operating account.  Each day, the lockbox agent would send computer files to petitioner containing the payment data for the prior day, which petitioner would use to update its accounts receivable and other records.

Overpayments, Refunds, and Credit Balances

Some of petitioner's customers remitted payment in excess of the amounts they actually owed. In certain instances, the customer would duplicate the required payment by first paying pursuant to the product invoice and subsequently making payment according to a monthly statement issued by petitioner prior to the receipt of the customer's initial payment.[1] All overpayments were applied to the customer's account, generally producing a credit balance in favor of the customer.

Petitioner's marketing materials and shipping invoices contained a statement of its return policy. The policy allowed customers to return any item with which the customer was not satisfied, for any reason, within 60 days of receipt.[2] The customer had the option of selecting a replacement, a full refund, or a credit to his account. Product returns during the 1995 taxable year totaled $1,154,395, which amounted to

---

[1] In their arguments, the parties distinguish between overpayments and duplicate payments. We, however, see no principled reason for distinguishing between the two. Accordingly, in our opinion we shall refer only to customer overpayments, which include overpayments of any amount.

[2] In certain instances in which the customer was not completely satisfied with the delivered product but nonetheless intended to use it, petitioner would negotiate with the customer an adjustment to the amount billed. Where the customer had previously paid the full invoice amount, this adjustment would result in a credit in favor of the customer. For purposes of this opinion, we shall consider invoice adjustments as part of customer returns.

approximately 2.89 percent of gross sales.  With respect to the 1996 taxable year, product returns totaled $1,251,401, approximately 2.82 percent of gross sales.

With regard to client credit balances resulting from overpayments or returns, petitioner's customers had the option of (1) applying any or all of the credit balance to a subsequent purchase, (2) causing a refund check to be issued, (3) having the amount credited back to the customer's credit card, or (4) retaining the credit balance in the customer's account with petitioner.  Petitioner did not routinely contact customers having a credit balance in their accounts due to the large number of orders, the relatively small amount of the credit balance, and the likelihood that the credit would be applied toward future purchases.  Nonetheless, it was the practice of petitioner's customer service personnel to inform the customer of any credit balance on his or her account when the customer called to place an order.  In addition, petitioner had a sales force of around 70 employees who were dedicated to serving those customers who purchased petitioner's infection control products (approximately one-third of petitioner's total customers).  The sales personnel were paid a commission on the amount of goods ordered.  Given that the existence of the credit balance made additional sales more likely (since the customer did not have to come out of pocket to the extent of the credit), the sales personnel had an

incentive to inform their customers of the existence of any credit balance.

In the absence of direction from the customer, petitioner retained the credit balance in the customer's account. If the customer placed a subsequent order, the credit balance was automatically applied against the cost of such order. If a client did not use or otherwise claim the amount reflected as a credit on his or her account, it was petitioner's practice to dispose of such amounts pursuant to the unclaimed property laws of the jurisdictions in which its customers resided.[3] Petitioner did not pay its customers interest with respect to the credit balances.

As of the close of the 1995 taxable year, 7,611 customers had credit balances on account with petitioner. These balances totaled $760,063. Gross sales during this period totaled $37,159,244. As of May 31, 1996, the number of customers having credit balances increased to 9,669, while the outstanding amount

---

[3] During the years in issue, Arizona followed a version of the Uniform Unclaimed Property Act of 1981 (UUPA 1981). See Ariz. Rev. Stat. Ann. secs. 44-301 to 44-340 (West 1994). Under UUPA 1981, intangible property held or owing in the ordinary course of the holder's business that has remained unclaimed by the owner for more than 5 years is considered abandoned. See UUPA 1981 sec. 2(a), 8B U.L.A. 595 (1993); see also Ariz. Rev. Stat. Ann. sec. 44-302 (West 1994). As a general rule, abandoned property must be delivered to the State of the owner's last known residence. See UUPA 1981 sec. 3(1), 8B U.L.A. 598 (1993); see also Ariz. Rev. Stat. Ann. sec. 44-303 (West 1994).

of such balances grew to $1,049,610.  Gross sales during the 1996

taxable year were $40,045,119.[4]

Money received by petitioner which gave rise to a customer

credit balance was deposited to petitioner's general

non-interest-bearing bank account.  The funds in this bank

account were available to and used by petitioner for regular

operating needs.  Although petitioner did not maintain a separate

account for funds attributable to the customer credit balances,

such amounts were reflected as a liability on petitioner's

general ledger for financial accounting purposes.

Petitioner's Method of Accounting and Respondent's Determination

In the course of an audit of petitioner's 1989 taxable year,

respondent determined that petitioner was required to include in

income the amount of customer credit balances that had been

outstanding for 2 years or more.  During the years at issue,

petitioner continued this practice by including in income for

financial and tax accounting purposes the amounts represented by

customer credit balances which had aged for 2 years.[5]  By way of

---

[4]  The record does not reflect what portion of the credit
balances were attributable to customer returns as opposed to
customer overpayments.

[5]  Petitioner nonetheless continued to consider the amounts
of the customer credit balances that were brought into income as
(continued...)

the notice of deficiency for the years in issue, respondent determined that amounts represented by the customer credit balances outstanding as of the close of the taxable years in issue constitute income in such year (to the extent not previously included in income), regardless of how long each particular credit balance had been outstanding. In response to respondent's determination, petitioner contends that the amounts reflected by the customer credit balances constitute income only if and when such credit balance is applied toward subsequent purchases.

## OPINION

In his posttrial brief, respondent now concedes that the portion of the customer credit balances attributable to product returns does not constitute gross income to petitioner, and we accept his concession in this regard. Given respondent's concession, the sole issue for decision is whether petitioner must include in income the customer overpayments remaining on hand at the close of the taxable periods in issue. The parties agree that the issue should be analyzed under the "claim of right" doctrine.

The claim of right doctrine was established by the Supreme

---

[5](...continued)
an obligation in favor of the customer. In other words, the credit balance still appeared on the customer's account, and the customer was still entitled to have the balance refunded or applied toward additional purchases.

Court in <u>North Am. Oil Consol. Co. v. Burnett</u>, 286 U.S. 417 (1932). In determining the proper taxable year in which to include income generated from land the legal title to which was subject to litigation, the Court stated as follows:

> If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. [<u>Id.</u> at 424.]

The Supreme Court elaborated on the claim of right doctrine in <u>James v. United States</u>, 366 U.S. 213, 219 (1961), as follows:

> When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." <u>North American Oil Consolidated Co. v. Burnet</u>, <u>supra</u>, at p. 424. In such case, the taxpayer has "actual command over the property taxed--the actual benefit for which the tax is paid," <u>Corliss v. Bowers</u>, <u>supra</u> [281 U.S. 376, 378 (1930)]. This standard brings wrongful appropriations within the broad sweep of "gross income"; it excludes loans. * * *

Accordingly, in order for the customer overpayments to be excluded from income, petitioner must establish either of the following: (1) The existence of a consensual recognition of petitioner's obligation to repay the overpayments to the remitting customers, or (2) the presence of a restriction on petitioner's disposition of the customer overpayments.

While the Supreme Court in <u>James</u> held that an explicit or implicit consensual recognition of the taxpayer's obligation to repay a given sum is sufficient to avoid that sum's being treated as income pursuant to the claim of right doctrine, the Court did not elaborate on what constitutes a "consensual" recognition. Numerous cases discussing the tax implications of the receipt of misappropriated funds have since interpreted the phrase (either explicitly or through application) as requiring a recognition of the repayment obligation on the part of the obligee as well as the obligor. See <u>Webb v. IRS</u>, 15 F.3d 203, 207 (1st Cir. 1994); <u>Collins v. Commissioner</u>, 3 F.3d 625, 632 (2d Cir. 1993), affg. T.C. Memo. 1992-478; <u>Solomon v. Commissioner</u>, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. T.C. Memo. 1982-603; <u>Moore v. United States</u>, 412 F.2d 974, 980 (5th Cir. 1969); <u>Howard v. Commissioner</u>, T.C. Memo. 1997-473.

The present case, however, does not involve the receipt of misappropriated funds. Petitioner did not acquire the customer overpayments through any form of deceit; rather, the overpayments were the product of inattentive bookkeeping on the part of petitioner's customers. Furthermore, there is no indication that petitioner acted in bad faith with respect to the overpayments. When petitioner processed the customer's payment and realized that the customer had remitted an amount in excess of the amount

owed, petitioner immediately posted a credit to such customer's account and treated the overpayment as a liability for financial accounting purposes.

While respondent notes that petitioner did not routinely inform its customers of the existence of the customer credit balances, we do not view this factor as decisive.  First, we accept the testimony of Dr. Hamann, petitioner's president and chief executive officer, that the credit balances tended to be eliminated through their application toward the purchase price of subsequent orders.  Second, we do not believe that petitioner intended for its customers to remain ignorant of the credit balances.  It was the practice of petitioner's customer service personnel to inform those customers who placed calls to petitioner of the existence of any credit balance to their account.  Furthermore, the sales personnel charged with servicing approximately one-third of petitioner's customers had an incentive to inform their customers of any credit balances, as the existence of the credit balance would increase the likelihood of additional sales upon which such personnel collected a commission.  Third, Dr. Hamann testified that customer satisfaction is of paramount importance to the financial success of petitioner's operation, given the limited number of health care professionals in need of the product line offered by petitioner.  We therefore do not believe petitioner would risk

offending its customers by attempting to prevent their knowledge and use of the credit balance posted on their accounts.

There existed an implicit recognition on the part of petitioner and its customers that the customers would be entitled to have any amounts which they overpaid returned to them. Additionally, the customers who submitted overpayments had at their disposal all of the information necessary to determine that they had in fact overpaid. The invoice which petitioner included with the product shipment, combined with a record of the customer's disbursements, would be sufficient for the customers to determine that they had a credit balance in their favor with petitioner. Given that the overpayments resulted from the conduct of petitioner's customers as opposed to that of petitioner, we believe that the level of knowledge which petitioner's customers possessed in this case is sufficient to satisfy the existence of a consensual recognition of petitioner's obligation to return the overpayments.[6] Accordingly, petitioner is not required to include in income pursuant to the claim of right doctrine the amount of the customer credit balances attributable to customer overpayments which remain outstanding as of the close of the taxable year.

---

[6] Given this determination, we need not decide whether there existed a restriction on petitioner's ability to dispose of the customer overpayments.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.
