# United States Tax Court

T.C. Memo. 2025-43

NORWICH COMMERCIAL GROUP, INC.,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket Nos. 3639-19, 8104-19.                     Filed May 12, 2025.

_____

P overreported more than $7 million in income on its 2007 through 2013 federal income tax returns. The overreported income is related to accounting and other errors in connection with P's warehouse lending business supported by lines of credit (LOC) at banks L and F. The errors resulted in severe undercollateralization of the LOC at bank L.

In 2014 P discovered the errors and signed an agreement providing additional collateral and agreeing to reduce the LOC balance with L by the amount of the mistaken undercollateralization of that LOC. P then claimed a "CLAIM OF RIGHT DOCTRINE ADJUSTMENT" deduction of $7,580,507 on its 2014 return. In 2014 P repaid L $1.2 million and received an interest credit from L of $599,112. It also paid F $626,388. In 2015 P repaid $5,476,577, representing the remaining balance due L under the agreement. R disallowed the 2014 deduction and the 2015 NOL carryover stemming from the claim of right doctrine but allowed the related income adjustments for open years, some of which are before the Court.

*Held*: P's inclusion of phantom income from 2007–13 was in accordance with the claim of right doctrine entitling

**[\*2]** P to a deduction for 2014, the year the errors were discovered and the collateralized obligation to reduce its LOC balance with L was executed.

*Held, further*, R's reduction of P's income for 2012 is upheld only in the amount of $383,728 to correct for accounting errors related to an LOC with F.

*Held, further*, the NOL carryforwards to 2014 and 2015 must be adjusted in accordance with the outcome of this Opinion.

————

*James N. Mastracchio*, *Susan E. Seabrook*, *Karl Kurzatkowski*, and *Paul N. Iannone*, for petitioner.

*William Derick*, *Athena K. Caiazzo*, *Stephen C. Best*, and *Nina P. Ching*, for respondent in docket No. 3639-19.

*William Derick*, *Athena K. Caiazzo*, and *Nina P. Ching*, for respondent in docket No. 8104-19.

MEMORANDUM FINDINGS OF FACT AND OPINION

COPELAND, *Judge*: The Commissioner of Internal Revenue (Commissioner) issued a Notice of Deficiency for tax years 2012 and 2014 to Petitioner, Norwich Commercial Group, Inc. (Norwich), determining deficiencies of $71,125 and $107,958, respectively.[1] The Commissioner later issued a Notice of Deficiency for tax year 2015 to Norwich determining a deficiency of $1,269,106. The deficiencies are largely attributable to a $7,580,507 deduction claimed by Norwich on its 2014 Form 1120, U.S. Corporation Income Tax Return, described as a "CLAIM OF RIGHT DOCTRINE ADJUSTMENT."

Norwich timely filed Petitions with this Court for redetermination of the deficiencies determined by the Commissioner for 2012, 2014, and 2015 (years at issue), and we consolidated the cases. After concessions, our decision turns on whether Norwich is allowed a deduction during the years at issue for (1) the overreporting of assets

---

[1] All dollar amounts are rounded to the nearest dollar.

[*3] and income in 2007–13 stemming from transactions with Liberty Bank (Liberty) and (2) overreporting of income for 2012 stemming from transactions with Farmington Bank (Farmington), because such income had been overreported from 2007–13 under the claim of right doctrine.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The First and Second Stipulations of Facts and the accompanying Exhibits are incorporated by this reference. Norwich maintained its principal place of business in Avon, Connecticut, when it filed its Petitions.

Phillip DeFronzo, a mortgage broker, incorporated Norwich in 1989 under the laws of Connecticut. Mr. DeFronzo held a majority of Norwich's common stock at all relevant times. Norwich is a C corporation.

## I. *Warehouse Lending*

During 2007–15 Norwich was a residential mortgage loan originator (originator). It engaged in warehouse lending transactions and maintained warehouse lines of credit (LOCs) with at least three banks: Liberty, Farmington, and People's United Bank. Norwich was not itself a bank.

A warehouse lending transaction is generally accomplished in several steps. First, the originator borrows funds from a warehouse lender by drawing on a warehouse LOC. Second, the originator provides the borrowed funds to a homebuyer (customer) in exchange for a secured promissory note (mortgage receivable). Third, the originator sells the mortgage receivable to a mortgage loan investor. Fourth, the originator deposits the proceeds from the mortgage receivable sale with the warehouse lender. Last, the warehouse lender subtracts amounts owed to it on the warehouse LOC from those proceeds and sweeps the remaining funds, representing the originator's mortgage fee income, into the originator's operating account (usually an account with the warehouse lender).

## II. *Liberty Warehouse LOC*

Liberty was Norwich's primary warehouse lender. Norwich and Liberty entered into a Line of Credit and Security Agreement (Agreement) on August 15, 2007. The Agreement stated that Norwich could borrow up to $5 million on the LOC it held with Liberty. All LOC

[*4] funds were to be used exclusively for originating first and second mortgage loans secured by residential real estate in Connecticut. Norwich was then to sell the mortgage receivables to institutional investors or mortgage banking entities satisfactory to Liberty. Over the course of several subsequent Omnibus Loan Document Modification Agreements, Norwich's LOC was increased to $30 million, and its permissible uses were expanded to include loans secured by real estate in several additional states, including Massachusetts, Vermont, New Hampshire, Maine, Florida, Tennessee, and Rhode Island. (We sometimes refer to the Line of Credit and Security Agreement and the Omnibus Loan Document Modification Agreements collectively as the "Agreements.")

In addition to the LOC, Norwich maintained separate clearing and operating bank accounts at Liberty. Norwich used the clearing account in virtually every step of its mortgage loan origination business. Funds obtained from the Liberty LOC were deposited by Liberty into the clearing account. Pursuant to the Agreements, Liberty was not to transfer LOC funds to the clearing account unless Norwich satisfied certain prerequisites. Norwich was to provide Liberty with a list of mortgage loan investors to whom Norwich would sell the mortgages, ensure the mortgage loans were underwritten in compliance with Federal National Mortgage Association standards, furnish the underwriting findings to Liberty, and designate one of Norwich's attorneys to hold the mortgage receivables as Liberty's agent before they were sold. Both the mortgage loan investors and the attorney had to be preapproved by Liberty. Advances on the LOC were evidenced by collateral, specifically mortgage receivables in which Norwich granted Liberty a corollary and continuing security interest. LOC advances were never to exceed the principal amount of the mortgage receivables, lest the LOC become undercollateralized. Whenever Norwich drew on the LOC, it did so to facilitate a specific customer's purchase of a specific house. Only Liberty had the authority to wire LOC funds into or out of the clearing account.

As described, after a closing on a home purchase, Norwich received a collateralized promissory note from the customer that Norwich would subsequently sell to an investor. Norwich (or the investor directly) then deposited the proceeds from the sale of the mortgage receivable into the clearing account and then Norwich informed Liberty of the deposit. Pursuant to the Agreements, Liberty was to take from the proceeds the amount it was due according to the relevant terms of the Agreements. Funds remaining in the clearing

[*5] account after Liberty took what it was owed were periodically swept at Norwich's request from the clearing account into the operating account.[2] While it lacked control of funds in the clearing account, Norwich had full discretionary control over funds in the operating account. Similar procedures were followed with the other warehouse lenders.

III.     *Accounting for the Liberty LOC*

Norwich hired Certified Public Accountant (CPA) William Schulz, of Schulz & Urbanski, P.C., sometime in the early 1990s. Mr. Schulz served as Norwich's CPA until 2013. He prepared Norwich's adjusting journal entries, financial statements (which he subsequently audited), and federal income tax returns for years 2007–13. Norwich is a calendar-year accrual basis taxpayer.

Mr. Schulz used statements provided by Liberty (including LOC, bank, and collateralized loan statements) to determine the amount of mortgage fee income Norwich received each year and Norwich's mortgage receivable balance. Norwich earned the mortgage fee income upon completion of each warehouse lending transaction. Mr. Schulz had a high level of confidence in the Liberty statements. Unknown to Mr. Schulz, Liberty provided Norwich with some inaccurate statements that he relied upon during the years at issue. When Mr. Schulz conducted Norwich's audits, he began with the unadjusted yearend balances reported in Norwich's accounting software. It was Mr. Schulz' responsibility to record any necessary adjusting journal entries to Norwich's financial records. One of the accounts he adjusted annually was a revenue account entitled "mortgage fee income." Norwich relied on Mr. Schulz to correctly reconcile and account for mortgage fee income at the end of each year.

Mr. Schulz began his annual adjusting journal entries by debiting cash and crediting mortgage fee income for all deposits to the clearing

---

[2] The record contains multiple LOC paydown request emails sent by Norwich to Liberty. Most of the emails state: "Pleas [sic] Pay-down our warehouse loan by the aggregate funding amounts listed below and deposit the remaining balance to our Liberty Bank operating account." The parties stipulated that Norwich made the transfers between accounts; however, the record further supports that such transfers were only made with Liberty's knowledge and approval. As is relevant here, Liberty periodically failed to act on Norwich's LOC paydown requests or transferred either less or more than instructed in payment of the LOC, many times less.

[*6] account.[3]  He knew that not all the deposits constituted mortgage fee income, but he used the mortgage fee income account as a reconciling account.  He next credited the cash account and debited mortgage fee income for moneys transferred back to Liberty in repayment of the LOC.  He then relied on Liberty's LOC and collateralized loan statements for additional adjustments to mortgage fee income to account for outstanding mortgage receivables that had yet to be sold to investors.[4]  He made these adjustments with the intention that the mortgage fee income account would accurately reflect mortgage fee income for the year, and Norwich's assets would be correctly stated.  The problem with his approach was that duplicate advances and failed and inaccurate paydowns by Liberty on the LOC were not detected, resulting in overstated (and for one year understated) mortgage fee income for 2007–13.  The mortgage receivable asset accounts securing the LOCs were likewise affected by these errors.  Liberty's advance and paydown errors are discussed in greater detail below.  The following table depicts Norwich's accounting as reported on each year's tax return:

| Year | Mortgage Receivables | Warehouse LOC Payable |
|------|---------------------|----------------------|
| 2007 | $2,082,164 | $2,068,645 |
| 2008 | 9,482,356 | 9,258,316 |
| 2009 | 11,571,765 | 11,359,540 |
| 2010 | 18,577,162 | 18,681,692 |
| 2011 | 18,075,903 | 17,580,697 |
| 2012 | 18,288,524 | 19,394,158 |
| 2013 | 21,222,777 | 21,222,624 |

Mr. Schulz issued an unqualified opinion that Norwich's financial statements fairly presented the financial position of Norwich for every year from 2007 to 2013.  Each year after preparing Norwich's audited financial statements, Mr. Schulz prepared Norwich's Form 1120.  The amounts reported as mortgage fee income on Norwich's 2007–13 audited

---

[3] Debits and credits are how business activity is recorded in a double-entry accounting system.  *See Debit*, *Black's Law Dictionary* (12th ed. 2024) *(*"[I]n bookkeeping, [a debit is] an entry made on the left side of a ledger or account, noting an increase in assets or a decrease in liabilities."); *id.*, *Credit* ("[A credit is] an accounting entry reflecting an addition to revenue or net worth . . . .").

[4] Mr. Schultz correspondingly recorded the unsold mortgage receivables as assets on Norwich's tax returns and audited financial statements (although, over the years, he variously labeled them "Mortgage receivables," "Mortgages receivable," "Secured mortgages," "Mortgage Notes Receivable," "Mortgage loans held for sale," or "Mortgage notes held for resale").

[*7] financial statements were identical to the amounts reported as mortgage fee income on Norwich's tax returns for those years.[5]  Mr. Schulz believed that mortgage fee income was correctly reported on Norwich's 2007–13 financial statements and tax returns.

IV.    *Discovery and Remediation of Liberty LOC Variances*

In response to a Joint Consent Order issued July 1, 2014, among Norwich, the Connecticut Department of Banking, and the Massachusetts Division of Banks,[6] Norwich began implementing new loan origination software.  On August 7, 2014, Norwich signed an engagement letter with the consulting firm TeraVerde Management Advisors (TVM).  TVM was originally tasked with assisting Norwich's transition to the new software.  While assisting with the transition, TVM was unable to reconcile some accounts because of inexplicable differences.  TVM initiated a thorough review of each step in Norwich's loan origination process and discovered that Norwich did not have sufficient collateral assets (i.e. mortgage receivables held for sale) to cover the funds then advanced and outstanding on the Liberty LOC.  Upon this discovery, Norwich directed TVM to investigate the LOC and the collateral variances.

On November 6, 2014, Liberty produced a statement indicating that the LOC balance was $20,102,799.  This is the amount Norwich still owed Liberty and was consistent with the Norwich's books and records.  TVM then assembled a detailed schedule of collateral held by Norwich that totaled $12,733,690, significantly less than the mortgage receivables asset recorded on Norwich's books and records.  The LOC therefore appeared to be "out of trust" (meaning advances on the LOC lacked supporting collateral) by approximately $7,369,000.  TVM

---

[5] This is true with for all years at issue except 2009.  Norwich's 2009 return erroneously reported the amount of mortgage fee income from its financial statements on the insurance premium revenue line item and vice versa.  This mistake is contained in the detail to Form 1120, Line 1a–Gross receipts or sales, and therefore does not affect the aggregate gross receipts reported on the return.

[6] The Joint Consent Order was implemented in order to protect borrowers; it required Norwich to "establish, implement, and maintain procedures to ensure that [Norwich] is capable of compiling and generating an accurate and complete loan list upon request" and to "retain[] complete loan files, including without limitation, documentation reflecting each loan application's outcome."  The Order further required Norwich to "ensure that no duplicate discharge/release recording fees are collected from Massachusetts or Connecticut borrowers."  Norwich was not required to restate its financial statements or file amended state or federal tax returns as a result of the Joint Consent Order.

[*8] considered the undercollateralization highly unusual for two reasons. First, the LOC had been "out of trust" for an extended period, from 2007 to 2014. Second, as of 2014 the LOC was "out of trust" by 25% or more of the total amount advanced. TVM concluded that the undercollateralization stemmed from errors made by Liberty and that "weak internal controls within [Norwich's] Accounting/Finance Department" prevented Norwich from detecting the errors.

TVM advised Norwich to contact Liberty to discuss the undercollateralization. Norwich contacted Liberty in mid-November 2014 and informed them that the LOC was significantly undercollateralized. Liberty did not initially believe Norwich was correct or that the situation was urgent. It took Norwich's chief financial officer several attempts to schedule a meeting with Liberty staff.

Representatives from Liberty and Norwich eventually met to discuss the issue. Liberty's representatives were shocked and deeply concerned upon learning that the LOC was "out of trust." On November 21, 2014, Liberty and Norwich entered into an agreement wherein both parties acknowledged that the LOC then had an unsecured "[o]ver-advance amount of approximately $7,300,000.00." Norwich agreed to provide Liberty additional collateral and to reduce the LOC to match the existing mortgage receivables held as security for the LOC. The additional collateral consisted of "a first lien on and security interest in" all of Norwich's business assets[7] including its mortgage servicing rights and goodwill, first mortgage liens on five delineated properties, and a second position mortgage on a second property. Norwich and Liberty also began working together to ascertain the origin and precise amount of the undercollateralization. Liberty hired its own outside firm, Sobel & Co. (Sobel), to verify the undercollateralization amount. Meanwhile, TVM reviewed every warehouse lending transaction from the inception of the LOC in 2007 through early 2015. Determining the origin and amount of the undercollateralization was no simple task for either party due to multiple transactions associated with each advance. In fact it took Sobel four months to complete its separate verification work. Liberty, Sobel, Norwich, and TVM collaborated with one another during this time.

---

[7] The business assets excluded mortgage loans pledged to Farmington and to People's United Bank.

**[\*9]** Together they determined that the net variances between the LOC and Norwich's collateral totaled $7,275,689 for 2007–14. The variances agreed to for each year were as follows:

| Year | Liberty LOC Collateral Variances |
|------|---------------------------------:|
| 2007 | $707 |
| 2008 | (4,216) |
| 2009 | 174,825 |
| 2010 | 1,329,028 |
| 2011 | 2,878,939 |
| 2012 | 443,395 |
| 2013 | 2,131,439 |
| 2014 | 321,572 |
| **Total** | **$7,275,689** |

The variances were primarily caused by three types of errors: duplicate advances, failed paydowns, and inaccurate paydowns. Duplicate advances occurred when, after Norwich requested an advance on the LOC, Liberty advanced the requested funds and then made a second, unrequested advance in exactly the same amount to Norwich. Failed and inaccurate paydowns began with Norwich's notifying Liberty that collateral (a mortgage receivable) for an advance had been transferred to an investor in exchange for cash that had been deposited into the clearing account. Liberty was then instructed to transfer the cash out from the clearing account to pay down the LOC; but Liberty either failed to do so (failed paydown) or took an amount different from what Norwich had instructed (inaccurate paydown).

The errors resulted in amounts advanced on the Liberty LOC without collateral to support them, and in over-reported mortgage receivable assets and income, all of which violated the terms of the Agreements. Also contrary to requirements of the parties' Agreements, the unsecured advances were swept from the clearing account into Norwich's operating account. Both Norwich and Liberty believed amounts swept into Norwich's operating account were Norwich's revenues from completed warehouse lending transactions.

TVM also identified two errors in the Farmington warehouse lending transactions during its review of the Liberty LOC. Proceeds from the sale of mortgage receivables related to Farmington's LOC had been erroneously deposited into the Liberty clearing account. Both

**[\*10]** deposit errors occurred in 2012.  Those deposits were $383,728 related to a transaction identified as the Bur\*\*\* mortgage loan (Farmington B mortgage loan) and $242,660 related to a transaction identified as the Czy\*\*\* mortgage loan (Farmington C mortgage loan).  The parties agree that the Farmington C mortgage loan deposit into the clearing account at Liberty did not result in over-reported mortgage fee income.  Norwich repaid the amounts related to the Farmington B and C mortgage loan deposit errors in 2014.

On March 23, 2015, Liberty and Norwich amended their November 21, 2014, agreement, in which they had memorialized their initial understanding of the undercollateralization.  They agreed to a net amount due of $6,676,577 as of November 6, 2014.  They arrived at this sum by reducing the total unsecured amount of $7,275,689 by a $599,112 interest credit, which they agreed upon because of excess interest on the LOC Norwich had paid Liberty as a result of the erroneously advanced funds.  Norwich reported the $599,112 interest credit as "other income" on its 2014 Form 1120 to correct interest expense deductions claimed for prior years.  Norwich began paying down the LOC balance as early as November 24, 2014.  Norwich paid Liberty $1.2 million in 2014 and $5,476,577 in 2015, with the final payment made on October 15, 2015.  Some of the funds used by Norwich to pay Liberty came from the sale of its profitable Mortgage Servicing Rights business.  Norwich also paid Farmington $626,388 in 2014.

V.    *Norwich's Tax Returns and Notices of Deficiency*

The following table reflects the parties' stipulations:

| Year | Overstatement (Understatement) |
|------|-------------------------------:|
| 2007 | $707 |
| 2008 | (4,216) |
| 2009 | 174,826 |
| 2010 | 1,329,029 |
| 2011 | 2,271,971 |
| 2012 | 1,434,091 |
| 2013 | 2,131,439 |
| **Total** | **$7,337,847** |

[*11] The parties thereby agree that Norwich overstated (and for one year understated) mortgage fee income on its 2007–13 income tax returns in the amounts delineated in the above table.

The total is computed by subtracting the 2014 LOC collateral variances from the total 2007–14 Liberty LOC collateral variances ($7,275,689 − $321,572 = $6,954,117),[8] then adding the $383,728 Farmington B mortgage loan ($6,954,117 + $383,728 = $7,337,845).[9] On its original 2014 return Norwich also added to the total the $242,660 Farmington C mortgage loan to calculate the $7,580,507 deduction it claimed. Norwich concedes that addition was incorrect. On its return Norwich described the deduction as a "CLAIM OF RIGHT DOCTRINE ADJUSTMENT." The record contains very little information about the Farmington B and C mortgage loans other than that they were accidentally deposited into Norwich's clearing account at Liberty in 2012 and repaid in 2014.

The Commissioner issued a Notice of Deficiency to Norwich for its 2012 and 2014 tax years, adjusting each of Norwich's 2012–14 tax returns and determining deficiencies of $71,125 for 2012 and $107,958 for 2014. The Commissioner disallowed Norwich's 2014 claim of right doctrine deduction in its entirety. For 2012 the Commissioner decreased Norwich's taxable income to account for the erroneous advances included in mortgage fee income and increased Norwich's section 179[10] deduction for depreciation expenses. Norwich completed and attached to its 2014 return a Corporation Application for Tentative Refund of $629,471 that Norwich later received. The tentative refund arose from Norwich's 2014 net operating loss (NOL) carryback to its 2012 tax year. The $71,125 deficiency is due to the refund's exceeding Norwich's allowed reductions to income for 2012.

The Commissioner likewise decreased Norwich's 2013 taxable income by an amount equal to the 2013 stipulated overstatement. In addition the Commissioner disallowed the entirety of Norwich's 2013

---

[8] Not to be confused with the $6,676,577 net over-advance amount agreed to by Liberty and Norwich, which is the sum of the 2007–14 LOC variances, $7,275,689, less the $599,112 interest credit.

[9] There remains a $2 discrepancy that is due to rounding.

[10] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*12] NYU tuition expense deduction and a portion of its NYC rent expense deduction. These adjustments increased the loss reported for 2013 by $2,087,697. That loss carries forward and affects the NOL adjustment made by the Commissioner in determining the 2014 deficiency.

In addition to the Commissioner's disallowance of the $7,580,507 claim of right deduction for 2014, the Commissioner made additional 2014 adjustments that are either uncontested by Norwich, stipulated by the parties, or related to NOL carryforwards and carrybacks that hinge on the outcome of the 2014 claim of right deduction. The aggregate adjustments resulted in an ordinary loss of $65,841 and an alternative minimum tax (AMT) due of $107,958 for 2014.

The Commissioner issued a Notice of Deficiency for Norwich's 2015 tax year determining a $1,269,106 deficiency. The deficiency is due to the decreased NOL carryover from 2014 applied to 2015 and a reduction to the section 179 depreciation deduction but offset by an increased AMT NOL carryover.

After concessions,[11] the issues for decision are (1) whether Norwich is entitled to deductions for amounts paid to Liberty and Farmington in 2014 and Liberty in 2015 to rectify prior income inclusions under the claim of right doctrine or whether those payments were simply repayments of loans and (2) if Norwich is entitled to deductions (i.e., the payments were not repayments of loans), for what year such deductions should be claimed. Our determinations also potentially affect the adjustments for the 2012 tax year and the carryover loss from 2013 into 2014.

OPINION

I.    *Introduction*

Norwich argues that it properly claimed a $7,337,847 deduction for 2014 for amounts previously received and reported as income for tax years 2007 through 2013 under the claim of right doctrine. Norwich

---

[11] The Commissioner and Norwich have stipulated that Norwich is entitled to deductions of $12,966 and $13,467 for "NYU tuition" for 2013 and 2014, respectively. In addition, the parties have stipulated that Norwich is not entitled to deduct "NYC rent expense" for 2013 but is entitled to deduct $8,326 for "NYC rent expense" for 2014. As indicated, *see supra* p. 10, Norwich concedes that the $242,660 Farmington C mortgage loan should not be included in calculating its overstatement of mortgage fee income.

**[\*13]** argues that because 2014 was the year in which it discovered it did not have an unrestricted right to the income it received in earlier years, 2014 was the proper year for the deduction. In the alternative Norwich suggests that deductions are allowable for the years of repayment, those being 2014 and 2015. The Commissioner argues that the overreporting of income for tax years 2007–13 was a result of Norwich's uncollateralized receipt of funds from Liberty and Farmington through the LOCs that were required to be repaid. Consequently, the moneys Liberty and Farmington failed to secure as repayments were continuing loans such that the claim of right doctrine does not apply. The Commissioner posits that the proper remedy is amending the prior year returns to the extent not barred by the statute of limitations. In the alternative the Commissioner argues that Norwich is not entitled to a deduction beyond the amount of economic performance, meaning the amounts repaid in the years repaid. The years at issue before the Court include 2012, 2014, and 2015.[12]

The claim of right doctrine is central to the disposition of this issue. If the claim of right doctrine applies, the amounts reported as mortgage fee income should have been included in Norwich's 2007–13 taxable income and would be deductible when required to be repaid. If the amounts were instead loans, they should not have been included in the prior years' income and are not deductible when repaid. If the payments were loans, the claim of right doctrine would not apply to remedy the prior improper inclusion of loan amounts in income.

II. *Burden of Proof*

The Commissioner's determinations in a Notice of Deficiency are generally presumed correct, and the taxpayer bears the burden of proving otherwise. Rule 142(a); *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Under certain circumstances the burden of proof shifts from the taxpayer to the Commissioner. *See* I.R.C. § 7491(a). Norwich does not contend that it has met the requirements for shifting the burden of proof, and the record

---

[12] Norwich's Petition in Docket No. 3639-19 did not assign error to (1) the increased 2014 installment sale gain, (2) the disallowed 2014 recourse reserve deduction related to that installment sale, or (3) the disallowed business expense related to a captive entity. Norwich is thus deemed to have conceded the correctness of those adjustments. *See* Rule 34(b)(1)(G); *Funk v. Commissioner*, 123 T.C. 213, 218 (2004).

**[\*14]** does not indicate otherwise. Thus, the burden of proof for all factual issues remains with Norwich.

III.    *Claim of Right Doctrine*

"[G]ross income means all income from whatever source derived," including "[g]ross income derived from business." I.R.C. § 61(a)(2); *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 429 (1955). Income is generally taxable for the year in which the taxpayer receives it, unless the taxpayer's regular method of accounting requires recognition of the income for a different year. *See* I.R.C. §§ 446, 451(a). Accrual method taxpayers like Norwich recognize taxable income when all events fixing the right to receive income have occurred and the amount can be determined with reasonable accuracy. *See* I.R.C. § 451(b).

The claim of right doctrine provides an interesting twist to determining when the receipt of funds constitutes taxable income and what happens when the income inclusion is later determined to be in error. The doctrine was first announced by the Supreme Court in *North American Oil Consolidated v. Burnet*, 286 U.S. 417 (1932). In that opinion the Supreme Court addressed the proper year for a company to include in income earnings the ownership of which was uncertain because of ongoing litigation. *Id.* at 420–22. The Supreme Court articulated the doctrine as follows:

> If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to [include on his] return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent.

*Id.* at 424. As a corollary, the Supreme Court went on to say that if in a later year "the company had been obliged to refund the profits received in [a prior year], it would have been entitled to a deduction from the profits of [the year of repayment], not from those of any earlier year." *Id.* In other words, if income that is received under claim of right and without restriction in one year is required to be repaid, it is deductible for the year of repayment and not by amending the return for the year of receipt.

The Supreme Court further clarified the doctrine, noting that "[t]here is a claim of right when funds are received and treated by a taxpayer as belonging to him. The fact that subsequently the claim is

**[\*15]** found to be invalid by a court does not change the fact that the claim did exist. A mistaken claim is nonetheless a claim . . . ." *Healy v. Commissioner*, 345 U.S. 278, 282 (1953). Thus, a mistake of fact about whether funds received are taxable income does not prevent the application of the claim of right doctrine. "Should it later appear that the taxpayer was not entitled to keep the money, . . . he would be entitled to a deduction in the year of repayment; the taxes due for the year of receipt would not be affected." *United States v. Skelly Oil Co.*, 394 U.S. 678, 680–81 (1969).

Moreover, the receipt of funds must be "without the consensual recognition, express or implied, of an obligation to repay." *James v. United States*, 366 U.S. 213, 219–20 (1961). Accordingly, a taxpayer has a claim of right to funds if the taxpayer (1) receives the funds, (2) controls the use and disposition of the funds, (3) asserts entitlement to the funds, treating them as its own, and (4) lacks consensual recognition of an obligation to repay the funds. *Id.*; *see also Vandenbosch v. Commissioner*, T.C. Memo. 2016-29, at \*13.

Importantly, after the caselaw under *North American Oil Consolidated* and its progeny developed, Congress stepped in to remedy a perceived inequity in the claim of right doctrine. Congress became concerned that tax rate changes from year to year could harm taxpayers who previously included items in income under the claim of right doctrine and had to claim their deduction for a later year in which tax rates were lower. Congress enacted section 1341 in response. *See* Internal Revenue Code of 1954, ch. 736, § 1341, 68A Stat. 3, 348; *see also Dominion Res., Inc. v. United States*, 219 F.3d 359, 363 (4th Cir. 2000) ("To relieve 'inequit[y][]' [in tax rate changes,] Congress enacted § 1341, which permits taxpayers [who were not adequately compensated from a deduction allowable in a later year] 'to recompute their taxes for the year of receipt' if they choose to do so. In sum, § 1341 is designed to put the taxpayer in essentially the same position he would have been in had he never received the returned income." (first alteration in original) (quoting *Skelly Oil Co.*, 394 U.S. at 682)).

Section 1341 applies if (1) "an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item," I.R.C. § 1341(a)(1), i.e., the taxpayer "must have included the item in income under a claim of right," *Alcoa, Inc. v. United States*, 509 F.3d 173, 177 (3d Cir. 2007)), (2) "a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did

**[\*16]** not have an unrestricted right to such item or to a portion of such item," I.R.C. § 1341(a)(2), and (3) "the amount of such deduction exceeds $3,000," I.R.C. § 1341(a)(3). "If these requirements are met, the taxpayer has two choices: he can deduct the item from the current year's taxes, or he can claim a tax credit for the amount his tax was increased in the prior year by including that item." *Fla. Progress Corp. & Subs. v. Commissioner*, 348 F.3d 954, 957 (11th Cir. 2003), *aff'g per curiam* 114 T.C. 587 (2000).

This provision, as explained by *Skelly Oil Co.*, 394 U.S. at 682, makes "clear that Congress did not intend to tamper with the underlying claim-of-right doctrine; it only provided an alternative for certain cases in which the new approach favored the taxpayer." Here, Norwich recognized the choice available under section 1341 but did not elect an alternate computation of taxes for the year of deduction because it acknowledged that the 2007–13 tax rates were not different from those of 2014.

Interestingly, both the claim of right doctrine and the possibility of subsequent but related deduction(s) must be considered here. For tax year 2012, which is likewise before us, Norwich overreported mortgage fee income by $1,434,091, which the Commissioner allowed as a downward adjustment to mortgage fee income in his Notice of Deficiency for 2012.[13] If the claim of right applies, that adjustment would be reversed. For 2014 the Commissioner disallowed the entire $7,580,507 deduction claimed by Norwich, represented by payments of $1.2 million in 2014 less the $321,572 advanced and repaid in 2014, and payments of $5,476,577 in 2015 to Liberty, payments of $626,388 to Farmington in 2014, and a $599,112 interest credit.[14] Both parties agree that $242,660 of the Farmington payment was never included in income. Also for 2014 the Commissioner increased the NOL carryover from 2013. The increase is affected by the Commissioner's $2,131,439 downward adjustment to mortgage fee income for 2013.

Thus, in these cases, we must first consider whether the items were subject to the claim of right doctrine and were therefore income instead of loans for 2007–13. If we determine that the claim of right doctrine should have applied, we must determine if and when the

---

[13] The Commissioner's adjustment in the Notice of Deficiency was $1,676,752 because he originally allowed an adjustment for $242,660 related to the Farmington C mortgage loan which, as we have discussed, Norwich now concedes was not included in income for 2012.

[14] As noted *supra* note 9, there remains a $2 rounding discrepancy.

[*17] deductions are allowed, all for 2014 or when cash payments were made for 2014 and 2015.  The parties do not dispute that Norwich received funds from Liberty and Farmington in 2007–13, and neither party has asserted that the repayment was not required.  Instead, the parties' dispute centers on the character of the payments (repayment of loans versus deduction) and the timing of the deduction, if allowed.  Essentially this is a dispute as to the fourth and final requirement set forth above in *James*, 366 U.S. at 219, *see supra* p. 15: whether at the time of receipt there was a consensual recognition of an obligation to repay the funds.

A.  *Liberty's Transfers of Funds: Mortgage Fee Income or Loans?*

1.  *The Parties' Legal Positions*

Norwich argues that the issues in these cases stem from Liberty's allowing transfers from the clearing account to Norwich's operating account that should not have occurred.  Norwich suggests that both parties believed and understood that such transfers represented earned mortgage fee income and, as a result, Norwich overreported such income.

The Commissioner argues that the origin of the funds was borrowing on an LOC, and that the "loan" was repaid when the error was discovered.  The Commissioner emphasizes that the LOC was overextended and that Norwich had an obligation to repay when the LOC distributions were made; therefore, he contends that the repayments were simply repayment of loans.  The Commissioner correctly asserts that loans are not income and that loan repayments are not deductible.  *See Commissioner v. Tufts*, 461 U.S. 300, 307 (1983).

The Commissioner contends that there was implicit consensual recognition between Liberty and Norwich that Norwich was obligated to pay back the erroneous advances.  *See James*, 366 U.S. at 219.  He cites *Smarthealth, Inc. v. Commissioner*, T.C. Memo. 2001-145, 81 T.C.M. (CCH) 1777, to support his contention.  In *Smarthealth*, 81 T.CM. (CCH) at 1781, we held that customer overpayments were not includible in a business' taxable income because there was an implicit recognition between the business and its customers that customers were entitled to a return of any overpayments they made.  The business was aware of the overpayments as they were made, recorded customer credit balances as liabilities on its general ledger, and informed customers of their credit

**[\*18]** balances when customers called to place subsequent orders. *Id.* at 1779.

2. *Analysis*

What makes these cases particularly complicated is that Norwich was in the business of facilitating loans. In order to earn mortgage fee income, Norwich relied on borrowing from its LOCs. Thus, the Commissioner focuses on the origin of the funds rather than the origin of the transaction that caused Norwich to receive funds as income. It is that income that all now agree Norwich was not actually entitled to receive. Thus, we must step back and look at the full picture of what occurred. The lending transactions were legitimate transactions and there is no doubt that the Liberty LOC draws deposited into Norwich's clearing account were required to be repaid. The key to these cases is that because Liberty accidentally advanced more funds than it should have and failed to properly secure repayments from sales to investors; both parties (Norwich and Liberty) operated under the assumption that Norwich was holding more collateral (assets) than existed; and Norwich was entitled to disbursement of more mortgage fee income than it had earned. Liberty transferred funds in error from the clearing account to the operating account, which were then accounted for as Norwich's earned mortgage fee income. *See* Treas. Reg. § 1.1341-1(a)(2) (defining "'income included under a claim of right' [as] an item included in gross income because it appeared from all the facts available in the year of inclusion that the taxpayer had an unrestricted right to such item"). If the mortgage receivables had been correctly accounted for, the mortgage fee income disbursements would not have occurred.

Important here is that Norwich incorrectly overreported its assets and its income and correctly reported its "Warehouse LOC Payable." To illustrate, the following table depicts mortgage receivables assets versus LOC liabilities related to LOC lending by Liberty as reported by Norwich on its tax returns. Similar amounts were reported on Norwich's financial statements, but the amounts due Liberty were not separately stated as with the tax returns.

[*19]

| Year | Mortgage Receivables | Warehouse LOC Payable |
|---|---|---|
| 2007 | $2,082,164 | $2,068,645 |
| 2008 | 9,482,356 | 9,258,316 |
| 2009 | 11,571,765 | 11,359,540 |
| 2010 | 18,577,162 | 18,681,692 |
| 2011 | 18,075,903 | 17,580,697 |
| 2012 | 18,288,524 | 19,394,158 |
| 2013 | 21,222,777 | 21,222,624 |
| 2014 | 12,733,690[15] | 20,102,799 |

There is no dispute that Norwich received funds from 2007 to 2014 originating from various LOCs and correctly reported those liabilities. There is likewise no dispute that mortgage receivables were overreported. Finally, there is no dispute that funds transferred from Norwich's clearing account to its operating account at Liberty were used in Norwich's business operations and not available to pay down the Liberty LOC when the undercollateralization error was discovered. The funds were unavailable because both Liberty and Norwich had assumed they were earned mortgage fee income and allowed their transfer to Norwich in earlier years. In fact, it took Norwich two years to restore the funds. Had the errors not been made, Liberty could have simply moved the funds back from the clearing account.

Here, both Liberty and Norwich understood Norwich to be entitled to the moneys transferred from the clearing account. In fact it took several months for TVM and Sobel to determine the total amount of erroneous advances. According to its understanding, Norwich recorded its receipt of the erroneous advances as income and adjusted its asset accounts for the "Mortgage receivables" on its financial statements and tax returns. The liability on the Liberty LOC was correctly recorded and reported. The assets supporting that LOC were reported in error. Unlike the taxpayer in *Smarthealth*, Norwich was unaware until 2014 that the erroneous transfers were not actually income. Norwich and Liberty were both equally unaware that the assets supporting the LOC were overstated. This lack of awareness was due in large part to incorrect statements provided by Liberty to Norwich and

---

[15] The tax returns and financial statements for 2014 and 2015 do not separately state the mortgage receivables held for sale that collateralized the LOC from Liberty (i.e. Liberty mortgage receivables) or the amount of the Liberty LOC, as in prior years. The amounts stated in the table are the mortgage receivables and LOC balance determined as of November 6, 2014, from the subsequent audit by TVM.

**[\*20]** relied on by both parties in maintaining the LOC. There was no implicit consensual recognition between Norwich and Liberty that the funds would later be repaid, as evidenced by the mutual acceptance of transfers that were swept into the operating account. We hold that there was no explicit or implicit recognition of an obligation to repay the erroneous transfers by either Norwich or Liberty until they were discovered in 2014.

B.    *Farmington B Mortgage Loan*

The Farmington loan proceeds deposited into the wrong account do not present the same issue as the Liberty mutual mistake of fact. Farmington did not improperly transfer funds to Norwich. The mistake with the Farmington proceeds seems to have been entirely due to Norwich's error. Farmington had no control over the Liberty clearing account and could not have caught or corrected the error. Petitioner has conceded that the $242,000 Farmington C mortgage loan proceeds were never taken into income, which leaves only the Farmington B mortgage loan proceeds of $383,728 received in 2012 and repaid in 2014 for consideration. Both parties agree that those loan proceeds were included in income by Norwich for 2012, and the 2012 Notice of Deficiency provides an adjustment for that improper inclusion. The only explanation provided for the $383,728 overstatement of taxable income during 2012 was that during TVM's review of the Liberty LOC it was discovered that mortgage loan proceeds from Farmington were mistakenly deposited into Liberty Bank's clearing account. That error does not present the same mutual mistake of fact as the Liberty errors. The Farmington B mortgage loan proceeds error that was mistakenly taken into income for 2012 is best addressed by the adjustment that the Commissioner has already made for this item such that 2012 mortgage fee income should be reduced by $383,728, and the remaining income adjustments for 2012 found in the Notice of Deficiency that reduced mortgage fee income should be reversed.

C.    *The Allowable Deduction, Timing, and Amount*

Given our holding that Norwich's inclusion in its 2007–13 taxable income of erroneous transfers from Liberty was in accordance with the claim of right doctrine, we must next address whether Norwich's deduction for 2014 should be respected. Norwich argues that the expenditure was an ordinary and necessary business expense under section 162, or in the alternative, a deductible loss under section 165. Norwich also argues that the entire amount of the error was deductible.

**[*21]** The Commissioner argues it was not a deductible expense or loss; and if it was, the deduction should be allowed only for the year of economic performance (i.e. limited to the amount and time of repayment). Thus, we must address (1) whether the payments and credits were a deductible expense or loss, and if so, (2) whether the deduction should be claimed for the year the payment obligation was established or the year of actual payment, and (3) the amount of the deduction.

### 1. *Deduction*

Section 162(a) provides that "[t]here shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business," and section 165(a) provides that taxpayers are entitled to deduct "any loss sustained during the taxable year and not compensated for by insurance or otherwise." We note at the outset that these cases present a dilemma similar to that faced by the Supreme Court in *Skelly Oil Co.*, 394 U.S. at 683, where there was "some dispute between the parties about whether the [repayments] in question [were] deductible as losses under [section] 165 of the 1954 Code or as business expenses under [section] 162." In that opinion, the Supreme Court explained that "[a]lthough in some situations the distinction may have relevance, cf. *Equitable Life Ins. Co. of Iowa v. United States*, 340 F.2d 9 (C.A. 8th Cir. 1965), we do not think it makes any difference here." *Id*. at 683–84. Similarly, here, a deduction under section 162 or 165 will not make a difference to the tax deficiencies ultimately determined in these cases. What is relevant here is that Norwich was required by Liberty to provide adequate interim collateral for the LOC and then pay down the LOC to the actual mortgage receivable balance. It was required to do so in order to be able to continue its mortgage origination line of business using the Liberty LOC in the future. Such an expenditure was necessary for Norwich to remain in business as it is difficult to envision a scenario in which any banking institution would continue to lend funds on an LOC to a mortgage originator who refused to maintain adequate collateral in support of the LOC. The payment can be construed as a payment related to a loss of the "[m]ortgage receivables" assets on Norwich's books and records that were found to be overstated.[16] Accordingly, Norwich may

---

[16] We note that Norwich's writedown of its mortgage receivables might likewise be construed as a writedown of worthless receivable assets under section 166(a)(1), which provides that "[t]here shall be allowed as a deduction any debt which becomes worthless within the taxable year." Of course, in this context it is a debt receivable

**[\*22]** claim a deduction as it clearly qualifies. *See also Dominion Res., Inc.*, 219 F.3d at 369 (allowing deduction of refunds paid to public utility customers related to moneys previously reported as income in error despite the fact that the refunds were not to the exact same customers, but they were required to be repaid and "therefore deductible expenses for purposes of the statute").

### 2.    *Timing*

Having determined deductibility, we must address the year or years for which Norwich may claim deductions.  Because of the delay in payment, the Commissioner argues that Norwich's deduction should be limited to the amount actually paid each year.  He asks us to evaluate the economic performance doctrine in determining when to allow a deduction.  Norwich argues that the repayment accrued in 2014 or in the alternative 2014 and 2015.

Importantly here, most cases arising under the claim of right doctrine involve cash basis taxpayers, but that does not dictate the proper treatment of an accrual basis taxpayer.  "One of the basic aspects of the federal income tax is that there be an annual accounting of income."  *Healy v. Commissioner*, 345 U.S. at 281.  Section 461(a) provides that income tax deductions are "taken for the taxable year which is the proper taxable year under the method of accounting used [by the taxpayer] in computing taxable income."  Norwich is an accrual basis taxpayer.

Generally, an accrual basis taxpayer may deduct expenses for the years in which it incurred the expenses, regardless of the actual payment dates.  Courts have recognized "the general rule on the timing of deductions when repayment of funds received under a claim of right is required: 'Any amount repaid is deductible in the year of repayment (on the cash basis) or the year in which the liability to repay becomes fixed (on the accrual basis).'"  *Quinn v. Commissioner*, 524 F.2d 617, 624 (7th Cir. 1975) (quoting *Estate of Whitaker v. Commissioner*, 259 F.2d 379, 382 (5th Cir. 1958), *aff'g* 27 T.C. 399 (1956)), *aff'g* 62 T.C. 223 (1974).  However, we must also consider that the all events test governs whether a business expense has been incurred to permit its accrual for tax purposes. *See Morning Star Packing Co., L.P. v. Commissioner*, T.C.

---

asset that was written down, not a liability written down as the Commissioner has argued.  We do not consider this analysis further as it was not advanced by the parties.

**[\*23]** Memo. 2020-142, at \*14, *aff'd*, Nos. 21-71191, et al., 2024 WL 5165718 (9th Cir. Dec. 19, 2024).

"[I]n determining whether an amount has been incurred with respect to any item . . . the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs." I.R.C. § 461(h)(1). The Commissioner agrees that we must respect the general rule in section 461(a) that "[t]he amount of any deduction or credit allowed by [the Code] shall be taken for the taxable year which is the proper taxable year under the method of accounting used [by the taxpayer] in computing taxable income." However, he suggests that we must focus on when economic performance occurred under section 461(h). He suggests that absent any other economic performance rules, "economic performance occurs as the taxpayer makes payments in satisfaction of the liability to the person to which the liability is owed." *See* Treas. Reg. § 1.461-4(g)(7).

Section 461(h) sets forth parameters for determining when economic performance occurs, and section 461(h)(2) outlines the timing rules for economic performance. Given that the claim of right doctrine effectively creates a liability for repayment of overstated income in the year of discovery, the most applicable timing provision is found in section 461(h)(2)(B), which establishes that "[i]f the liability of the taxpayer requires the taxpayer to provide property or services, economic performance occurs as the taxpayer provides such property or services." Here, Norwich was required to immediately provide property by restoring collateral for the LOC and then to quickly pay down the LOC. As previously discussed, the parties' November 21, 2014, agreement gave Liberty "a first lien on and security interest in" all of Norwich's business assets. *See supra* p. 8. Thus, economic performance occurred when the agreement was signed and collateral was given.

In fact Treasury Regulation § 1.1341-1(e) bolsters this conclusion, providing:

> The provisions of section 1341 and this section shall be applicable in the case of a taxpayer on the cash receipts and disbursements method of accounting only to the taxable year in which the item of income included in a prior year (or years) under a claim of right is actually repaid. However, in the case of a taxpayer on the cash receipts and disbursements method of accounting who constructively received an item of income under a claim of right and

**[\*24]** included such item of income in gross income in a prior year (or years), the provisions of section 1341 and this section shall be applicable to the taxable year in which the taxpayer is required to relinquish his right to receive such item of income.  Such provisions shall be applicable in the case of other taxpayers only to the taxable year which is the proper taxable year (under the method of accounting used by the taxpayer in computing taxable income) for taking into account the deduction resulting from the restoration of the item of income included in a prior year (or years) under a claim of right.  For example, if the taxpayer is on an accrual method of accounting, the provisions of this section shall apply to the year in which the obligation properly accrues for the repayment of the item included under a claim of right.

Treasury Regulation § 1.1341-1(e) can thus be harmonized with section 461(h) such that the year in which the obligation to restore an accrual basis taxpayer's overstated income is secured by providing cash or other collateral establishes the year of deduction.

Here, the obligation to correct prior errors was memorialized in 2014, when Norwich provided additional collateral to Liberty and when Norwich and Liberty signed an agreement ensuring the reduction of the LOC.  That agreement was amended in March 2015 after further detailed analysis of the LOC's undercollateralization by both parties. Under the terms of the agreement, Norwich provided substitute assets for the missing mortgage receivables, received an interest credit of $599,112, paid $1.2 million in 2014 and agreed to pay down the LOC by an additional $5,476,577 in 2015.  Because providing collateral as a substitute for the underreported mortgage receivables satisfied section 461(h)(2)(B), all events relating to that obligation were met in 2014 and that is the year for which the deduction is appropriate.  Thus, we reject the Commissioner's position that the deduction should be allowed only for the years of cash payment and uphold the deduction for 2014, but only in the amount more fully set forth below.

### 3.    *Deductible Amount*

Turning to the amount of the deduction, we note that while Norwich claimed a "CLAIM OF RIGHT DOCTRINE ADJUSTMENT" deduction of $7,580,507 on its 2014 Form 1120, Norwich now claims

[*25] entitlement to a total deduction of only $7,337,847.[17]   Norwich calculates the deduction by subtracting from total Liberty erroneous advances of $7,275,689 the $321,572 erroneously advanced by Liberty in 2014 (and therefore corrected before it was included in taxable income that year) and adding the Farmington B mortgage loan of $383,728.[18] The Commissioner requests that we disallow any deduction for the interest adjustment.   Norwich argues that it is entitled to the full amount of the improper inclusion in income (including the adjustment for $599,112 credited back for interest overpayments).

First and foremost, we have held above that the claim of right involved only the mutual mistakes between Norwich and Liberty and that the amounts ultimately paid to Farmington are not deductible for 2014.  *See supra* p. 20.  That leaves us to consider the $599,112 credit that Norwich took into income for 2014.  Norwich included in 2014 income the interest credit because it involved the return of interest payments that had been deducted for prior years.  But that does not resolve whether that credit should also be considered in the claim of right related adjustment.  The effect of the credit was as if Liberty had made a payment to Norwich to return the amount of overpaid interest and then Norwich paid that exact amount back to Liberty.  First, the credit involved interest income accrued, paid, and deducted on the Liberty line of credit in 2007–14; consequently, it was properly included in income when the corresponding credit was received.  However, the credit also served to restore funds distributed by mistake and should be respected as part of the claim of right related deduction for 2014 for all of the reasons stated in this Opinion.  Overall the 2014 deduction is limited to the 2007–13 overreporting of income related to the mistake of fact with Liberty that Norwich corrected by supplying additional collateral and subsequently repaid through cash payments and a credit from Liberty.  The deductible amount is $6,954,117 calculated as follows: $7,275,689 of total Liberty overreporting less the $321,572 amount already corrected for 2014.

IV.   *Conclusion*

For the 2012 tax year the Commissioner reduced Norwich's income by $1,676,752 to account for Norwich's overreporting of

---

[17] This $242,660 difference is the result of Norwich's concession that the Farmington C mortgage loan should not be included in determining its total overstatement of mortgage fee income.

[18] This calculation equals $7,337,845.  The additional $2 difference is due to rounding.  *See supra* note 9.

**[\*26]** mortgage fee income; however, because Norwich received most of that income from Liberty under a claim of right, the correct reduction is only $383,728 related to Norwich's reporting loan funds from Farmington as income in error. For 2014 Norwich may deduct $6,954,117 for the erroneous prior year actions by Liberty in transferring to Norwich's operating account more than it was entitled to, actions that were corrected in 2014. For all years at issue, the NOLs must be adjusted. Any additional particulars related to the adjustments may be addressed by the parties in their Rule 155 computations.

To reflect the foregoing and other concessions by the parties,

*Decisions will be entered under Rule 155.*